UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                     )
H. BRUCE BOAL and SCOTT LEE BOAL     )
A Partnership d/b/a BOALEECO,        )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )         Civil Action No. 04-12634-NG
                                     )
FLEETBOSTON FINANCIAL CORPORATION    )
(f/k/a Fleet National Bank),         )
                                     )
        Defendant.                   )
_____ )

**OPPOSITION OF DEFENDANT FLEET
NATIONAL BANK TO PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER**

        Defendant Fleet National Bank ("Fleet"), erroneously named FleetBoston Financial

Corporation (f/k/a Fleet National Bank) in the Verified Complaint, hereby responds in opposition

to the *Ex Parte* Motion for Temporary Restraining Order filed in this action by plaintiffs H.

Bruce Boal and Scott Lee Boal, A Partnership d/b/a Boaleeco ("Boaleeco").  As set forth below,

Boaleeco has not met the required showing of likelihood of success on the merits or an

irreparable injury if the letter of credit is paid in order for this Court to issue or extend the

requested Temporary Restraining Order ("TRO").  This Court should therefore deny Boaleeco's

Motion seeking a TRO.

**I.      PROCEDURAL HISTORY**

        The Verified Complaint in this action was filed in Essex County, Massachusetts Superior

Court on or about December 10, 2004.  Plaintiffs' *Ex Parte* Motion for Temporary Restraining

Order (the "First Motion for TRO") was filed along with the Verified Complaint.  A copy of the

First Motion for TRO is attached hereto as Exhibit 1.  On the same date, the Superior Court

(Welch, J.) entered an Order of Notice making the First Motion for TRO returnable on December

16, 2004 at 2:00 p.m.

On December 13, 2004, plaintiffs filed an Emergency *Ex Parte* Motion for

Reconsideration Regarding Plaintiff's *Ex Parte* Motion for TRO (the "Second Motion for

TRO"), along with an Affidavit of Thomas J. Flanagan, seeking entry of a TRO until such time

that the Superior Court rendered a decision on the First Motion for TRO.  In an Order entered on

that date, the Superior Court allowed the Second Motion for TRO (the "TRO Order").  In its

TRO Order, a copy of which is attached hereto as Exhibit 2, the Superior Court ordered that:

> Defendant [Fleet] is preliminarily enjoined from the date of this Order from
> paying any funds to Central Bank of Egypt on the letter of credit originally issued
> on October 25, 1988.  This [TRO] shall continue in effect until such time as this
> Court, sitting at Lawrence, decides Plaintiff's [First Motion for TRO], which is
> scheduled for hearing at 2:00 p.m. on Thursday, December 16, 2004 at Lawrence
> Superior Court.  This Order expires at 2:00 p.m. December 16, 2004.

On December 15, 2004, Fleet filed its Notice of Removal with the United States District

Court for the District of Massachusetts.  This Court has original jurisdiction over this action by

reason of a federal question conferred by United States law, 12 U.S.C. § 632, because Fleet is a

national banking association organized and existing under the laws of the United States, and the

cause of action arises out of international banking transactions.  In light of the removal of this

action to this Court, the Superior Court did not hold a hearing on plaintiffs' First Motion for

TRO on December 16, 2004 as originally scheduled.

Although the Superior Court's TRO Order "expires at 2:00 p.m. December 16, 2004," it

also states that Fleet is "preliminarily enjoined" from paying on the letter credit until such time

that the Superior Court holds a hearing on plaintiff's First Motion for TRO.  See Exhibit 2.

Pursuant to 28 U.S.C. § 1450, the TRO order remains "in full force and effect until dissolved or

modified" by this Court.  Because Fleet removed this action to this Court, thereby depriving the Superior Court of jurisdiction over the case and resulting in the cancellation of the scheduled hearing, Fleet's counsel has agreed with plaintiffs' counsel to abide by the injunction set forth in the Superior Court's TRO Order until such time that this Court rules on plaintiffs' First Motion for TRO.

Fleet hereby opposes plaintiffs' First Motion for TRO.  Fleet was served with the First Motion for TRO on December 13, 2004 and, pursuant to Local Rule 7.1(B)(2), has fourteen days or until December 27, 2004 to file its opposition papers.  Because time is of the essence and Fleet has been contacted by the beneficiary of the standby letter of credit at issue seeking immediate payment, Fleet requests that this Court schedule and hold a hearing on plaintiffs' First Motion for TRO on the earliest available date.[1]

## II.   FACTUAL BACKGROUND

In its Verified Complaint (a copy is attached hereto as Exhibit 3), Boaleeco alleges that on or about October 25, 1988, Fleet issued a standby letter of credit, in the original amount of $157,170.00, on behalf of its customer Boaleeco (the "Standby Letter of Credit").  Exhibit 3 at ¶ 3.  The Standby Letter of Credit was issued to secure Boaleeco's performance of contractual obligations to a third party.  Id. at ¶ 4.  The beneficiary of the Standby Letter of Credit was changed to the Central Bank of Egypt ("CBE"), and the amount of the Standby Letter of Credit was later changed to $50,000.00.  Id. at ¶¶ 5-6; Affidavit of Michael E. Evans attached hereto (the "Evans Aff.") at ¶¶ 1, 3.  The Standby Letter of Credit expires on December 30, 2004.  Exhibit 3 at ¶ 7.  The Standby Letter of Credit is an irrevocable letter of credit that was issued

---

[1] Although the standby letter of credit that gave rise to this dispute expires on December 30, 2004, this case and plaintiffs' First Motion for TRO will not be mooted by the passage of that date.  Since Fleet was contacted by the confirming bank for the beneficiary requesting a drawdown on the standby letter of credit before the expiration date, absent a TRO or other injunction Fleet will be obligated to make payment on the standby letter of credit even after its expiration date.

bearing number 50027518. Evans Aff. at ¶ 1 (a copy of the Standby Letter of Credit with

pertinent amendments is attached as Exhibit A to the Evans Affidavit).

The Verified Complaint alleges that although no claims have been made that Boaleeco

failed to perform its obligations on the underlying contract, the beneficiary CBE intends to draw

on the Standby Letter of Credit. Exhibit 3 at ¶ 9. Fleet has been contacted by Citibank, N.A.

("Citibank"), the confirming bank on the Standby Letter of Credit, which has been presented

with conforming documents and is obligated to collect funds for the beneficiary, CBE. Evans

Aff. at ¶¶ 3-4.

Fleet relies on the confirming bank (here, Citibank) to review the presented documents to

determine if payment under a standby letter of credit is required. Id. at ¶ 5. "Here, Citibank has

determined that the documents required for payment are conforming and [Fleet] is obligated to

pay the amount of the [Standby] Letter of Credit to the beneficiary." Id. Since Fleet has a good

reputation in the international banking community for honesty in honoring its obligations, Fleet

will suffer injury to its reputation if this Court were to enjoin Fleet from making payment on the

Standby Letter of Credit. Id. at ¶ 6.

## III.  RELIEF SOUGHT IN PLAINTIFFS' MOTION FOR TRO

Plaintiffs' First Motion for TRO seeks a restraining order or preliminary injunction

enjoining Fleet from making payment to CBE under the Standby Letter of Credit. The First

Motion for TRO relies upon the Verified Complaint and contains no other argument. Plaintiffs'

Second Motion for TRO, which was supported by the Affidavit of Thomas J. Flannagan and was

allowed by the Superior Court, explains the need for expedition since Fleet would have had no

choice but to make payment on the Standby Letter of Credit on December 13, 2004 absent entry

of the TRO Order. See Exhibit 2.

IV.  **ARGUMENT**

Plaintiffs' First Motion for TRO seeks to enjoin Fleet from making payment on the Standby Letter of Credit.  Such an attempt should be stopped, for otherwise letters of credit would lose their utility in the commercial marketplace.

Much like a preliminary injunction, a TRO is a drastic and extraordinary remedy that may be granted only upon a clear showing by the plaintiff that:  (1) it is likely to succeed on the merits of its claims; (2) it would suffer irreparable injury absent the granting of the injunctive relief sought; (3) a balancing of hardships and equities weighs in favor of the party seeking preliminary relief; and (4) the injunction is consistent with the public interest.  Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 990 F.2d 25, 26 (1st Cir. 1991); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); Accu-Soft Corp. v. Mattel, Inc., 117 F. Supp. 2d 99, 102 (D. Mass. 2000).  Boaleeco has not and cannot meet any of these requirements for entry of a TRO or preliminary injunction.

A.     Boaleeco Has Not Made a Showing that it is Likely to Succeed on the Merits

At bottom, Boaleeco has no legal claim against Fleet in this action.  Boaleeco has filed this action only to stop Fleet from making payment to CBE under the Standby Letter of Credit -- a temporary injunction to preserve the status quo.  The Verified Complaint contains no claim for damages against Fleet.  Since Boaleeco has no legal claim against Fleet, Boaleeco has not and cannot establish that it is likely to succeed on the merits.

Indeed, Boaleeco addresses likelihood of success on the merits requirement in the Verified Complaint as follows:

> Boaleeco has a reasonable likelihood of success on the merits of its claim because there has been no claim or demand upon Boaleeco under the subject contract and there is no basis for demand [upon] Fleet on the letter of credit.  The original

> beneficiary of the letter of credit, SCU, upon information and belief, is no longer
> in operation.

Exhibit 3 at ¶ 14. Boaleeco is asserting that the beneficiary of the Standby Letter of Credit,

CBE, with whom it apparently has a contractual relationship, has made no claim or demand that

Boaleeco failed to perform any duty or obligation under the contract. That may well be the case,

but it does nothing to establish that Boaleeco is likely to succeed on the merits of its claim --

indeed, any claim it may or would have is against CBE, not Fleet.

    The merits of any claim Boaleeco may have against Fleet are dispelled by a brief review

of the law regarding letters of credit. Letters of credit generally, and this Standby Letter of

Credit specifically, are governed by the Uniform Customs and Practice for Documentary Credits

("UCP"), *International Chamber of Commerce*, Publication No. 500 (1993) (copy attached

hereto as Exhibit 4), see Evans Aff. at ¶ 2, and the Uniform Commercial Code ("U.C.C."). See

generally Ground Air Transfer, Inc. v. Westates Airlines, Inc., 899 F.2d 1269 (1st Cir. 1990).

The U.C.C. explicitly states that an issuing bank such as Fleet "must honor a . . . demand for

payment which complies with the terms of the relevant contract regardless of whether the . . .

documents conform to the underlying contract . . . between the customer and the beneficiary."

U.C.C. § 5-114(1). Furthermore, "the U.C.C. narrowly circumscribes the circumstances under

which a court can enjoin the issuer from making such a payment." Ground Air Transfer, 899

F.2d at 1272 (citing U.C.C. § 5-114(2)).

    Thus, the general rule is that courts will not normally issue an injunction to enjoin

payment on a letter of credit. Id. at 1273; Itek Corp. v. First Nat'l Bank of Boston, 730 F.2d 19,

24-25 (1st Cir. 1984); Interco, Inc. v. First Nat'l Bank of Boston, 560 F.2d 480, 484-86 (1st Cir.

1977). This rule reflects judicial recognition that a letter of credit is a contract between the

issuing bank and the beneficiary, which is a wholly separate and distinct contract than those

between the issuer and its customer, and between the customer and beneficiary.  See Ground Air

Transfer, 899 F.2d at 1272; U.C.C. § 5-114 comment 1 ("The letter of credit is essentially a

contract between the issuer and the beneficiary and is recognized  by this Article as independent

of the underlying contract between the customer and the beneficiary.").  Once conforming

documents have been presented to the issuing bank by the beneficiary, as is the case here, the

issuer is obligated to make payment on the letter of credit.

     The only exception to the normal rule recognized in the U.C.C. that could possibly apply

here is when the party seeking the injunction establishes that there was "fraud in the transaction."

See U.C.C. § 5-114(b)(2); Itek Corp., 730 F.2d at 23-25.  Here, Boaleeco has made no allegation

that there was fraud in the presentation of documents to Fleet for payment under the Standby

Letter of Credit.  The fraud exception does not apply here.

     Since Boaleeco has failed to establish that it is likely to succeed on the merits of any

claim, this Court should deny the First Motion for TRO.

     B.    No Irreparable Injury

     Boaleeco clearly will not suffer irreparable harm if the TRO Order is dissolved without

entry of a new TRO or preliminary injunction.  In the Verified Complaint, Boaleeco asserts that

it will be irreparably harmed if Fleet is allowed to make payment under the Standby Letter of

Credit because "it will be nearly impossible to recoup those funds from CBE, whose offices are,

upon information and belief, in Cairo, Egypt, and who is not, or may not, upon information and

belief, be susceptible to service and jurisdiction in the Commonwealth."  Exhibit 3 at ¶ 12.

However, if the TRO Order was dissolved and payment under the Standby Letter of Credit was

made by Fleet to its beneficiary CBE, Boaleeco would have an action for money damages

against CBE if presentation of documentation for payment under the Standby Letter of Credit

was not justified under the circumstances.  Although Boaleeco's remedy against CBE may be difficult to pursue or ultimately may not be available to Boaleeco in the Commonwealth of Massachusetts, that does not mean the remedy does not exist altogether.

Boaleeco has an adequate remedy at law -- an action against CBE in the appropriate forum, whatever forum that may be.  Where an adequate remedy at law exists, as here, the only conclusion possible is that the injury alleged is not irreparable and preliminary injunctive relief should be denied.  For example, in KMW International v. Chase Manhattan Bank, N.A., 606 F.2d 10 (2d Cir. 1979), the U.S. Court of Appeals for the Second Circuit refused to enjoin payment under a letter of credit.  In that case, the plaintiff had requested an irrevocable performance letter of credit in favor of an Iranian bank.  The Second Circuit, in reversing the district court, found that there was no showing of irreparable harm.  Id. at 14-15.

The KMW court noted that the plaintiff, not the issuing bank, had assumed the risks of the underlying transaction.  There, the risk of conducting of business internationally, in a country such as Iran, was one assumed by the customer/plaintiff, not the issuing bank.  Id. at 15. Similarly, here it was Boaleeco, not Fleet, that assumed the risk of conducting business internationally -- Boaleeco entered into a contract with an international party and requested that its bank, Fleet, issue the Standby Letter of Credit to secure its performance.  Boaleeco should not now be permitted to shift the risk away from itself by requesting that this Court issue a restraining order preventing Fleet from making payment on the Standby Letter of Credit.

The fact that it may be difficult for Boaleeco to pursue its remedy outside the United States is not sufficient.  This case is distinguishable from Itek Corp., where the Court determined that the party seeking to enjoin payment on a letter of credit would suffer irreparable harm upon payment because the only jurisdiction under the contract where a remedy could be pursued was

Iran, at a time when Iran's courts were completely inaccessible to United States citizens. 730 F.2d at 22-23. Boaleeco has made absolutely no showing that the only location for it to pursue its contractual remedy against the beneficiary would be a foreign jurisdiction that is similarly closed to United States entities. Boaleeco has failed to establish that it will suffer irreparable injury if Fleet makes payment to the beneficiary under the Standby Letter of Credit, as it is required to do.

C.    A Balancing of Hardships and the Public Interest Favor Fleet

Boaleeco has presented no evidence in the Verified Complaint that would suggest that a balancing of hardships or the public interest favor issuing a restraining order. However, Fleet has presented evidence that it "has a good reputation in international banking circles for honesty in honoring its obligations" as an issuing bank in letter of credit transactions. Evans Aff. at ¶ 6. Fleet may well suffer injury to its reputation if it is further enjoined from making payment on the Standby Letter of Credit. Id. Moreover, judicial interpretation of letters of credit generally, which encompass an independent contract between the issuing bank and beneficiary, supports a finding that no restraining order or preliminary injunction should issue here.

By virtue of issuing the Standby Letter of Credit, Fleet and Boaleeco are subject to the UCP. UCP Article 4 makes clear that "all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate." Exhibit 4 at 2, Article 4. It would frustrate the UCP's goal of seamless international commerce to grant Boaleeco a restraining order further enjoining payment of the Standby Letter of Credit in order to allow Boaleeco to litigate the merits of its performance under its contract with CBE. The balancing of hardships and public interest factors favor Fleet in this dispute. The First Motion for TRO should be denied, and the Superior Court's TRO Order should be dissolved.

## V.    <u>CONCLUSION</u>

Boaleeco has failed to satisfy the prerequisites for entry of a Temporary Restraining Order to enjoin payment under the Standby Letter of Credit.  For all the reasons set forth above, this Court should deny plaintiffs' First Motion for TRO and dissolve the TRO Order issued by the Superior Court.

FLEET NATIONAL BANK, ERRONEOUSLY
NAMED FLEETBOSTON FINANCIAL
CORPORATION,

By its Attorneys,


 /s/ *J. Patrick Kennedy*
Donn A. Randall, BBO #631590
J. Patrick Kennedy, BBO #565778
Bulkley, Richardson and Gelinas, LLP
One Post Office Square, Suite 3700
Boston, MA  02109
(617) 368-2500
Fax: (617) 368-2525

Dated: December 27, 2004

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(D), Fleet hereby requests that the Court schedule a hearing to consider plaintiff's First Motion for TRO at the earliest available date.  Fleet believes that oral argument may assist the Court, and wishes to be heard as soon as possible because the Superior Court's TRO Order currently enjoins Fleet from making payment under the Standby Letter of Credit.

 /s/ *J. Patrick Kennedy*
J. Patrick Kennedy

285999-1

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                          TRIAL COURT OF THE COMMONWEALTH
                                    SUPERIOR COURT DEPARTMENT
                                    CIVIL ACTION NUMBER:

```
H. BRUCE BOAL and SCOTT LEE BOAL,        )
A Partnership d/b/a BOALEECO,            )
               Plaintiff                 )
                                         )
v.                                       )
                                         )
FLEETBOSTON FINANCIAL CORPORATION        )
(f/k/a Fleet National Bank),             )
               Defendant                 )
```

### *Ex Parte* MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff H. Bruce Boal and Scott Lee Boal, A Partnership d/b/a Boaleeco ("Boaleeco") respectfully requests that this Court enjoin Defendant FleetBoston Financial Corporation (Fleet") as follows:

(a)     Temporarily and preliminarily enjoin Fleet from paying any funds to CBE on account of the letter of credit; and

(b)     award such other relief and issue such other orders as justice may require.

As grounds for this Motion, Boaleeco hereby incorporates by reference the Verified Complaint.

Boaleeco also submits a proposed Order.

                        Respectfully submitted,
                        H. Bruce Boal and Scott Lee Boal,
                        A Partnership d/b/a Boaleeco,
                        By Its Attorneys,


                        Robert L. Holloway, Jr., BBO #238560
                        Thomas J. Flannagan, BBO #564328
                        MCLEAN HOLLOWAY DOHERTY ARDIFF & MORSE P.C.
                        8 Essex Center Drive
                        Peabody, MA 01960
Dated: December 10, 2004   (978) 774-7123

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL ACTION NUMBER: 04- 2225 - C

| | |
|---|---|
| H. BRUCE BOAL and SCOTT LEE BOAL, | ) |
| A Partnership d/b/a BOALEECO, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| FLEETBOSTON FINANCIAL CORPORATION | ) |
| (f/k/a Fleet National Bank), | ) |
| Defendant | ) |

## ~~Proposed~~ Order

Plaintiff Boaleeco's "Emergency *Ex Parte* Motion for Reconsideration Regarding Plaintiff's *Ex Parte* Motion for Temporary Restraining Order" is ALLOWED. After reconsideration, Plaintiff's *Ex Parte* Motion for Temporary Restraining Order is ALLOWED. Accordingly, Defendant FleetBoston Financial Corporation is preliminarily enjoined from the date of this Order from paying any funds to Central Bank of Egypt on the letter of credit originally issued on October 25, 1988. This temporary restraining order shall continue in effect until such time as this Court, sitting at Lawrence, decides Plaintiff's original "*Ex Parte* Motion for Temporary Restraining Order", which is scheduled for hearing at 2:00 PM on Thursday, December 16, 2004 at Lawrence Superior Court. *This order expires at 2:00PM December 16, 2004.*

By the Court,

Richard E Welch , J.

12/15/04

Elizabeth Churchion Aventure
DEPUTY ASST CLERK

Flannagan, Thomas J./28144-1/TJF/49907

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL ACTION NUMBER:

| | |
|---|---|
| H. BRUCE BOAL and SCOTT LEE BOAL, | ) |
| A Partnership d/b/a BOALEECO, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| FLEETBOSTON FINANCIAL CORPORATION | ) |
| (f/k/a Fleet National Bank), | ) |
| Defendant | ) |

## VERIFIED COMPLAINT

### Parties

1.  Plaintiffs H. Bruce Boal and Scott Lee Boal are partners doing business as Boaleeco [hereinafter "Boaleeco"], with a usual place of business at Waters Way Industrial Park, 56 Pulaski Street, Peabody, Essex County, Massachusetts.

2.  The Defendant, FleetBoston Financial Corporation (f/k/a Fleet National Bank) [hereinafter "Fleet"], is a corporation with offices in this Commonwealth at 100 Federal Street, Boston, Suffolk County, Massachusetts.

### Factual Background

#### The Letter of Credit

3.  On or about October 25, 1988, Fleet issued a standby letter of credit [hereinafter "letter of credit"] in the original amount of $157,170.00) on behalf of Boaleeco and with a beneficiary of the "Supreme Council of Universities" [hereinafter "SCU"].

4.  The letter of credit was issued to secure Boaleeco's performance "to comply with the terms of Contract No. SCU/25-88/ARF."

5.  On or about June 30, 1989, Fleet amended the letter of credit to change the beneficiary thereof from SCU to the Central Bank of Egypt [hereinafter "CBE"].

6.  On or about June 16, 1998, Fleet further amended the letter of credit to change the amount thereof to $50,000.00.

7. On or about April 23, 2004, Fleet further amended the letter of credit to change the expiration date to December 30, 2004.

8. To this date, December 10, 2004, at no time have any claims been made to Boaleeco by SCU or CBE alleging failure to perform under the subject contract.

9. However, Boaleeco has recently been informed by Fleet that CBE intends to draw on the letter of credit.

10. Neither SCU nor CBE are entitled to draw funds on account of the letter of credit

11. Despite this fact, Fleet has informed Boaleeco that it intends to honor the recent request by CBE to draw such funds.

12. If Fleet is permitted to pay the funds to CBE, thereby obligating Boaleeco to pay on the letter of credit, Boaleeco will be irreparably harmed because it will be nearly impossible to recoup those funds from CBE, whose offices are, upon information and belief, in Cairo, Egypt, and who is not, or may not, upon information and belief, be susceptible to service and jurisdiction in the Commonwealth.

13. The damage that Boaleeco will likely suffer if Fleet is permitted to pay funds to CBE on account of the letter of credit cannot be adequately and completely remedied at law.

14. Boaleeco has a reasonable likelihood of success on the merits of its claim because there has been no claim or demand upon Boaleeco under the subject contract and there is no basis for demand Fleet on the letter of credit. The original beneficiary of the letter of credit, SCU, upon information and belief, is no longer in operation.

15. Boaleeco seeks an injunction to prohibit Fleet from paying over any funds to CBE on account of the letter of credit to preserve the *status quo* until such time as the issue of whether there is any valid claim by CBE against Boaleeco is resolved.

16. The injunctive relief sought by Boaleeco will not harm Fleet but will preserve the *status quo*. Denial of the injunctive relief sought will irreparably harm Boaleeco now and into the future because it will not be possible for Boaleeco to recoup the funds from CBE if they are improperly or wrongfully paid to CBE by Fleet.

WHEREFORE, Boaleeco requests that this Court:

(a) Issue temporary injunctive relief to enjoin Fleet from paying any funds to CBE on account of the letter of credit;

(b) Preliminarily and permanently enjoin Fleet from paying any funds to CBE on account of the letter of credit; and

(c) award such other relief and issue such other orders as justice may require

Respectfully submitted,
H. Bruce Boal and Scott Lee Boal,
A Partnership d/b/a Boaleeco,
By Its Attorneys,

Robert L. Holloway, Jr., BBO #238560
Thomas J. Flannagan, BBO #564328
MacLEAN HOLLOWAY DOHERTY ARDIFF & MORSE, P.C.
8 Essex Center Drive
Peabody, MA  01960
Dated: December 10, 2004    (978) 774-7123

## VERIFICATION

I, H. Bruce Boal, have read the above Verified Complaint and hereby verify that the facts stated therein are true and based upon my own personal knowledge, information and/or belief and/or on the books and records of Boaleeco and, insofar as they are based upon information and belief, I believe them to be true.

Signed this tenth day of December, 2004 under the pains and penalties of perjury.

H. Bruce Boal

3

.: We are 2031 :: WeR2031.Group :: Chúng ta là :

:: LÓP 2031 :: KHOA TIỀN TỆ - TÍN DỤNG QUỐC TẾ :: HỌC VIỆN NGA

# UNIFORM CUSTOMS AND PRACTICE FOR

## DOCUMENTARY CREDITS

ICC Publication **No. 500** Effective January 1, 1994

## GENERAL PROVISIONS AND DEFINITIONS

### ARTICLE 1

### Application of UCP

The Uniform Customs and Practice for Documentary Credits, 1993 Revision, ICC Publication No. 50O, shall apply to all Documentary Credits (including to the extent to which they may be applicable, Standby Letter(s) of Credit) where they are incorporated into the text of the Credit. They are binding on all parties thereto, unless otherwise expressly stipulated in the Credit.

### ARTICLE 2

### Meaning of Credit

For the purposes of these Articles, the expressions "Documentary Credit(s)" and "Standby Letter(s) of Credit" (hereinafter referred to as "Credit(s)"), mean any arrangement, however named or described, whereby a bank (the "Issuing Bank") acting at the request and on the instructions of a customer (the "Applicant") or on its own behalf,

i. is to make a payment to or to the order of a third party (the "Beneficiary"), or is to accept and pay bills of exchange (Draft(s)) drawn by the Beneficiary,

or

ii. authorizes another bank to effect such payment, or to accept and pay such bills of exchange (Draft(s)),

or

iii. authorizes another bank to negotiate, against stipulated document(s), provided that the terms and conditions of the Credit are complied with.

For the purposes of these Articles, branches of a bank in different countries are considered another bank.

### ARTICLE 3

### Credits v. Contracts

A. Credits, by their nature, are separate transactions from the sales or other contract (s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfill any other obligation under the Credit, is not subject to claims or defenses by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary.

B. A Beneficiary can in no case avail himself of the contractual relationships existing between the banks or between the Applicant and the Issuing Bank.

## ARTICLE 4

### Documents v. Goods/Services/Performances

In Credit operations all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate.

## ARTICLE 5

### Instructions to Issue/Amend Credits

A. Instructions for the issuance of a Credit, the Credit itself, instructions for an amendment thereto, and the amendment itself, must be complete and precise.

In order to guard against confusion and misunderstanding, banks should discourage any attempt:

i. to include excessive detail in the Credit or in any amendment thereto;

ii. to give instructions to issue, advise or confirm a Credit by reference to a Credit previously issued (similar Credit) where such previous Credit has been subject to accepted amendment(s), and/or unaccepted amendment(s).

B. All instructions for the issuance of a Credit and the Credit itself and, where applicable, all instructions for an amendment thereto and the amendment itself, must state precisely the document(s) against which payment, acceptance or negotiation is to be made.

# FORM AND NOTIFICATION OF CREDITS

## ARTICLE 6

### Revocable v. Irrevocable Credits

A. A Credit may be either

i. revocable,

or

ii. irrevocable.

B. The Credit, therefore, should clearly indicate whether it is revocable or irrevocable.

C. In the absence of such indication the Credit shall be deemed to be irrevocable.

## ARTICLE 7

### Advising Bank's Liability

A. A Credit may be advised to a Beneficiary through another bank (the "Advising Bank") without engagement on the part of the Advising Bank, but that bank, if it elects to advise the Credit, shall take reasonable care to check the apparent authenticity of the Credit which it advises. If the bank elects not to advise the Credit, it must so inform the Issuing Bank without delay.

B. If the Advising Bank cannot establish such apparent authenticity it must inform, without delay, the bank from which the instructions appear to have been received that it has been unable to establish the authenticity of the Credit and if it elects nonetheless to advise the Credit it must inform the Beneficiary that it has not been able to establish the authenticity of the Credit.

## ARTICLE 8

### Revocation of a Credit

A. A revocable Credit may be amended or canceled by the Issuing Bank at any moment and without prior notice to the Beneficiary.

B. However, the Issuing Bank must:

i. reimburse another bank with which a revocable Credit has been made available for sight payment, acceptance or negotiation for any payment, acceptance or negotiation made by such bank prior to receipt by it of notice of amendment or cancellation, against documents which appear on their face to be in compliance with the terms and conditions of the Credit;

ii. reimburse another bank with which a revocable Credit has been made available for deferred payment, if such a bank has, prior to receipt by it of notice of amendment or cancellation, taken up documents which appear on their face to be in compliance with the terms and conditions of the Credit.

---

### ARTICLE 9

### Liability of Issuing and Confirming Banks

A. An irrevocable Credit constitutes a definite undertaking of the Issuing Bank, provided that the stipulated documents are presented to the Nominated Bank or to the Issuing Bank and that the terms and conditions of the Credit are complied with:

i. if the Credit provides for sight payment to pay at sight;

ii. if the Credit provides for deferred payment to pay on the maturity date(s) determinable in accordance with the stipulations of the Credit; iii. if the Credit provides for acceptance;

a. by the Issuing Bank to accept Draft(s) drawn by the Beneficiary on the Issuing Bank and pay them at maturity,

or

b. by another drawee bank to accept and pay at maturity Draft(s) drawn by the Beneficiary on the Issuing Bank in the event the drawee bank stipulated in the Credit does not accept Draft(s) drawn on it, or to pay Drafts(s) accepted but not paid by such drawee bank at maturity;

iv. if the Credit provides for negotiation to pay without recourse to drawers and/or bona fide holders, Draft(s) drawn by the Beneficiary and/or document(s) presented under the Credit. A Credit should not be issued available by Draft(s) on the Applicant. If the Credit nevertheless calls for Draft(s) on the Applicant, banks will consider such Draft(s) as an additional document(s).

B. A confirmation of an irrevocable Credit by another bank (the "Confirming Bank") upon the authorization or request of the Issuing Bank, constitutes a definite undertaking of the Confirming Bank, in addition to that of the issuing Bank, provided that the stipulated documents are presented to the Confirming Bank or to any other Nominated Bank and that the terms and conditions of the Credit are complied with:

i. If the Credit provides for sight payment to pay at sight;

ii. if the Credit provides for deferred payment to pay on the maturity date(s) determinable in accordance with the stipulations of the Credit;

iii. if the Credit provides for acceptance:

a. by the Confirming Bank to accept Draft(s) drawn by the Beneficiary on the Confirming Bank and pay them at maturity,

or

b. by another drawee bank to accept and pay at maturity Draft(s) drawn by the

Beneficiary on the Confirming Bank, in the event the drawee bank stipulated in the Credit does not accept Draft(s) drawn on it, or to pay Draft(s) accepted but not paid by such drawee bank at maturity;

iv. if the Credit provides for negotiation to negotiate without recourse to drawers and/or bona fide holders, Draft(s) drawn by the Beneficiary and/or document(s) presented under the Credit. A Credit should not be issued available by Draft(s) on the Applicant. If the Credit nevertheless calls for Draft(s) on the Applicant, banks will consider such Draft(s) as an additional document(s).

C. i. If another bank is authorized or requested by the Issuing Bank to add its confirmation to a Credit but is not prepared to do so, it must so inform the Issuing Bank without delay.

ii. Unless the Issuing Bank specifies otherwise in its authorization or request to add confirmation, the Advising Bank may advise the Credit to the Beneficiary without adding its confirmation.

D. i. Except as otherwise provided by Article 48, an irrevocable Credit can neither be amended nor canceled without the agreement of the Issuing Bank, the Confirming Bank, if any, and the Beneficiary.

ii. The Issuing Bank shall be irrevocably bound by an amendment(s) issued by it from the time of the issuance of such amendment(s). A Confirming Bank may extend its confirmation to an amendment and shall be irrevocably bound as of the time of its advice of the amendment. A Confirming Bank may, however, choose to advise an amendment to the Beneficiary without extending its confirmation and if so, must inform the Issuing Bank and the Beneficiary without delay.

iii. The terms of the original Credit (or a Credit incorporating previously accepted amendment(s)) will remain in force for the Beneficiary until the Beneficiary communicates his acceptance of the amendment to the bank that advised such amendment. The Beneficiary should give notification of acceptance or rejection of amendment(s). If the Beneficiary fails to give such notification, the tender of documents to the Nominated Bank or Issuing Bank, that conform to the Credit and to not yet accepted amendment(s), will be deemed to be notification of acceptance by the Beneficiary of such amendment(s) and as of that moment the Credit will be amended.

iv. Partial acceptance of amendments contained in one and the same advice of amendment is not allowed and consequently will not be given any effect.

---

## ARTICLE 10

### Types of Credit

A. All Credits must clearly indicate whether they are available by sight payment, by deferred payment, by acceptance or by negotiation.

B. i. Unless the Credit stipulates that it is available only with the Issuing Bank, all Credits must nominate the bank (the "Nominated Bank") which is authorized to pay, to incur a deferred payment undertaking, to accept Draft(s) or to negotiate. In a freely negotiable Credit, any bank is a Nominated Bank.

Presentation of documents must be made to the Issuing Bank or the Confirming Bank, if any, or any other Nominated Bank.

ii. Negotiation means the giving of value for Draft(s) and/or document(s) by the bank authorized to negotiate. Mere examination of the documents without giving of value does not constitute a negotiation.

C. Unless the Nominated Bank is the Confirming Bank, nomination by the Issuing Bank does not constitute any undertaking by the Nominated Bank to pay, to incur a deferred payment undertaking, to accept Draft(s), or to negotiate. Except where expressly

agreed to by the Nominated Bank and so communicated to the Beneficiary, the Nominated Bank's receipt of and/or examination and/or forwarding of the documents does not make that bank liable to pay, to incur a deferred payment undertaking, to accept Draft(s), or to negotiate.

D. By nominating another bank, or by allowing for negotiation by any bank, or by authorizing or requesting another bank to add its confirmation, the Issuing Bank authorizes such bank to pay, accept Draft(s) or negotiate as the case may be, against documents which appear on their face to be in compliance with the terms and conditions of the Credit and undertakes to reimburse such bank in accordance with the provisions of these Articles.

## ARTICLE 11

### Teletransmitted and Pre Advised Credit

A. i. When an Issuing Bank instructs an Advising Bank by an authenticated teletransmission to advise a Credit or an amendment to a Credit, the teletransmission will be deemed to be the operative Credit instrument or the operative amendment, and no mail confirmation should be sent. Should a mail confirmation nevertheless be sent, it will have no effect and the Advising Bank will have no obligation to check such mail confirmation against the operative Credit instrument or the operative amendment received by teletransmission.

ii. If the teletransmission states "full details to follow" (or words of similar effect) or states that the mail confirmation is to be the operative Credit instrument or the operative amendment, then the teletransmission will not be deemed to be the operative Credit instrument or the operative amendment. The Issuing Bank must forward the operative Credit instrument or the operative amendment to such Advising Bank without delay.

B. If a bank uses the services of an Advising Bank to have the Credit advised to the Beneficiary, it must also use the services of the same bank for advising an amendment (s).

C. A preliminary advice of the issuance or amendment of an irrevocable Credit (pre advice), shall only be given by an Issuing Bank if such bank is prepared to issue the operative Credit instrument or the operative amendment thereto. Unless otherwise stated in such preliminary advice by the Issuing Bank, an Issuing Bank having given such pre advice shall be irrevocably committed to issue or amend the Credit, in terms not inconsistent with the pre advice, without delay.

## ARTICLE 12

### Incomplete or Unclear Instructions

If incomplete or unclear instructions are received to advise, confirm or amend a Credit, the bank requested to act on such instructions may give preliminary notification to the Beneficiary for information only and without responsibility. This preliminary notification should state clearly that the notification is provided for information only and without the responsibility of the Advising Bank. In any event, the Advising Bank must inform the Issuing Bank of the action taken and request it to provide the necessary information.

The Issuing Bank must provide the necessary information without delay. The Credit will be advised, confirmed or amended, only when complete and clear instructions have been received and if the Advising Bank is then prepared to act on the instructions.

# LIABILITIES AND RESPONSIBILITIES

## ARTICLE 13

### Standard for Examination of Documents

A. Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit. Compliance of the stipulated documents on their face with the terms and conditions of the Credit, shall be determined by international standard banking practice as reflected in these Articles. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit.

Documents not stipulated in the Credit will not be examined by banks. If they receive such documents, they shall return them to the presenter or pass them on without responsibility.

B. The Issuing Bank, the Confirming Bank, if any, or a Nominated Bank acting on their behalf, shall each have a reasonable time, not to exceed seven banking days following the day of receipt of the documents, to examine the documents and determine whether to take up or refuse the documents and to inform the party from which it received the documents accordingly.

C. If a Credit contains conditions without stating the document(s) to be presented in compliance therewith, banks will deem such conditions as not stated and will disregard them.

## ARTICLE 14

### Discrepant Documents and Notice

A. When the Issuing Bank authorizes another bank to pay, incur a deferred payment undertaking, accept Draft(s), or negotiate against documents which appear on their face to be in compliance with the terms and conditions of the Credit, the Issuing Bank and the Confirming Bank, if any, are bound:

i. to reimburse the Nominated Bank which has paid, incurred a deferred payment undertaking, accepted Draft(s), or negotiated,

ii. to take up the documents.

B. Upon receipt of the documents the Issuing Bank and /or Confirming Bank, if any, or a Nominated Bank acting on their behalf, must determine on the basis of the documents alone whether or not they appear on their face to be in compliance with the terms and conditions of the Credit. If the documents appear on their face not to be in compliance with the terms and conditions of the Credit, such banks may refuse to take up the documents.

C. If the Issuing Bank determines that the documents appear on their face not to be in compliance with the terms and conditions of the Credit, it may in its sole judgment approach the Applicant for a waiver of the discrepancy(ies). This does not, however, extend the period mentioned in sub Article 13 (b).

D. i. If the Issuing Bank and/or Confirming Bank, if any, or a Nominated Bank acting on their behalf, decides to refuse the documents, it must give notice to that effect by telecommunication or, if that is not possible, by other expeditious means, without delay but no later than the close of the seventh banking day following the day of receipt of the documents. Such notice shall be given to the bank from which it received the documents, or to the Beneficiary, if it received the documents directly from him.

ii. Such notice must state all discrepancies in respect of which the bank refuses the documents and must also state whether it is holding the documents at the disposal of, or is returning them to, the presenter.

iii. The Issuing Bank and/or Confirming Bank, if any, shall then be entitled to claim

from the remitting bank refund, with interest, of any reimbursement which has been made to that bank.

E. If the Issuing Bank and/or Confirming Bank, if any, fails to act in accordance with the provisions of this Article and/or fails to hold the documents at the disposal of, or return them to the presenter, the Issuing Bank and/ or Confirming Bank, if any, shall be precluded from claiming that the documents are not in compliance with the terms and conditions of the Credit.

F. If the remitting bank draws the attention of the Issuing Bank and/or Confirming Bank, if any, to any discrepancy(ies) in the document(s) or advises such banks that it has paid, incurred a deferred payment undertaking, accepted Draft(s) or negotiated under reserve or against an indemnity in respect of such discrepancy(ies), the Issuing Bank and/or Confirming Bank, if any, shall not be thereby relieved from any of their obligations under any provision of this Article. Such reserve or indemnity concerns only the relations between the remitting bank and the party towards whom the reserve was made, or from whom, or on whose behalf, the indemnity was obtained.

---

## ARTICLE 15

### Disclaimer on Effectiveness of Documents

Banks assume no liability or responsibility for the form, sufficiency, accuracy, genuineness, falsification or legal effect of any document(s), or for the general and/or particular conditions stipulated in the document(s) or superimposed thereon; nor do they assume any liability or responsibility for the description, quantity, weight, quality, condition, packing, delivery, value or existence of the goods represented by any document(s), or for the good faith or acts and/or omissions, solvency, performance or standing of the consignors, the carriers, the forwarders, the consignees or the insurers of the goods, or any other person whomsoever.

---

## ARTICLE 16

### Disclaimer on the Transmission of Messages

Banks assume no liability or responsibility for the consequences arising out of delay and/or loss in transit of any message(s), letter(s) or document(s), or for delay, mutilation or other error(s) arising in the transmission of any telecommunication. Banks assume no liability or responsibility for errors in translation and/or interpretation of technical terms, and reserve the right to transmit Credit terms without translating them.

---

## ARTICLE 17

### Force Majeure

Banks assume no liability or responsibility for the consequences arising out of the interruption of their business by Acts of God, riots, civil commotions, insurrections, wars or any other causes beyond their control, or by any strikes or lockouts. Unless specifically authorized, banks will not, upon resumption of their business, pay, incur a deferred payment undertaking, accept Draft(s) or negotiate under Credits which expired during such interruption of their business.

---

## ARTICLE 18

### Disclaimer for Acts of an Instructed Party

A. Banks utilizing the services of another bank or other banks for the purpose of giving effect to the instructions of the Applicant do so for the account and at the risk of such Applicant.

B. Banks assume no liability or responsibility should the instructions they transmit not be carried out, even if they have themselves taken the initiative in the choice of such other bank(s).

C. i. A party instructing another party to perform services is liable for any charges, including commissions, fees, costs or expenses incurred by the instructed party in connection with its instructions.

iu. Where a credit stipulates that such charges are for the account of a party other than the instructing party, and charges cannot be collected, the instructing party remains ultimately liable for the payment thereof.

D. The Applicant shall be bound by and liable to indemnify the banks against all obligations and responsibilities imposed by foreign laws and usages.

### ARTICLE 19

#### Bank to Bank Reimbursement Arrangements

A. If an Issuing Bank intends that the reimbursement to which a paying, accepting or negotiating bank is entitled, shall be obtained by such bank (the "Claiming Bank"), claiming on another party (the "Reimbursing Bank"), it shall provide such Reimbursing Bank in good time with the proper instructions or authorization to honor such reimbursement claims.

B. Issuing Banks shall not require a Claiming Bank to supply a certificate of compliance with the terms and conditions of the Credit to the Reimbursing Bank.

C. An Issuing Bank shall not be relieved from any of its obligations to provide reimbursement if and when reimbursement is not received by the Claiming Bank from the Reimbursing Bank.

D. The Issuing Bank shall be responsible to the Claiming Bank for any loss of interest if reimbursement is not provided by the Reimbursing Bank on first demand, or as otherwise specified in the Credit, or mutually agreed, as the case may be.

E. The Reimbursing Bank's charges should be for the account of the Issuing Bank. However, in cases where the charges are for the account of another party, it is the responsibility of the Issuing Bank to so indicate in the original Credit and in the reimbursement authorization. In cases where the Reimbursing Bank's charges are for the account of another party they shall be collected from the Claiming Bank when the Credit is drawn under. In cases where the Credit is not drawn under, the Reimbursing Bank's charges remain the obligation of the Issuing Bank.

## DOCUMENTS

### ARTICLE 20

#### Ambiguity as to the Issuers of Documents

A. Terms such as "first class", "well known", "qualified", "independent", "official", "competent", "local", and the like, shall not be used to describe the issuers of any document(s) to be presented under a Credit. If such terms are incorporated in the Credit, banks will accept the relative document(s) as presented, provided that it appears on its face to be in compliance with the other terms and conditions of the Credit and not to have been issued by the Beneficiary.

B. Unless otherwise stipulated in the Credit, banks will also accept as an original document(s), a document(s) produced or appearing to have been produced: i. by reprographic, automated or computerized systems; ii. as carbon copies; provided that it is marked as original and, where necessary, appears to be signed.

A document may be signed by handwriting, by facsimile signature, by perforated

signature, by stamp, by symbol, or by any other mechanical or electronic method of authentication.

C. i. Unless otherwise stipulated in the Credit, banks will accept as a copy(ies), a document(s) either labeled copy or not marked as an original a copy(ies) need not be signed.

ii. Credits that require multiple document(s) such as "duplicate", "two fold", "two copies" and the like, will be satisfied by the presentation of one original and the remaining number in copies except where the document itself indicates otherwise.

D. Unless otherwise stipulated in the Credit, a condition under a Credit calling for a document to be authenticated, validated, legalized, visaed, certified or indicating a similar requirement, will be satisfied by any signature, mark, stamp or label on such document that on its face appears to satisfy the above condition.

## ARTICLE 21

Unspecified Issuers or Contents of Documents When documents other than transport documents, insurance documents and commercial invoices are called for, the Credit should stipulate by whom such documents are to be issued and their wording or data content. If the Credit does not so stipulate, banks will accept such documents as presented, provided that their data content is not inconsistent with any other stipulated document presented.

## ARTICLE 22

### Issuance Date of Documents Vs. Credit Date

Unless otherwise stipulated in the Credit, banks will accept a document bearing a date of issuance prior to that of the Credit, subject to such document being presented within the time limits set out in the Credit and in these Articles.

## ARTICLE 23

### Marine/Ocean Bill of Lading

A. If a Credit calls for a bill of lading covering a port to port shipment, banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. appears on its face to indicate the name of the carrier and to have been signed or otherwise authenticated by:

• the carrier or a named agent for or on behalf of the carrier, or

• the master or a named agent for or on behalf of the master.

Any signature or authentication of the carrier or the master must be identified as carrier or master, as the case may be. An agent signing or authenticating for the carrier or master must also indicate the name and the capacity of the party, i.e. carrier or master, on whose behalf that agent is acting,

and

ii. indicates that the goods have been loaded on board, or shipped on a named vessel.

Loading on board or shipment on a named vessel may be indicated by pre printed wording on the bill of lading that the goods have been loaded on board a named vessel or shipped on a named vessel, in which case the date of issuance of the bill of lading will be deemed to be the date of loading on board and the date of shipment.

In all other cases loading on board a named vessel must be evidenced by a notation on the bill of lading which gives the date on which the goods have been loaded on board, in which case the date of the board notation will be deemed to be the date of shipment.

If the bill of lading contains the indication "intended vessel", or similar qualification in relation to the vessel, loading on board a named vessel must be evidenced by

an on board notation on the bill of lading which, in addition to the date on which the goods have been loaded on board, also includes the name of the vessel on which the goods have been loaded, even if they have been loaded on the vessel named as the "intended vessel".

If the bill of lading indicates a place of receipt or taking in charge different from the port of loading, the on board notation must also include the port of loading stipulated in the Credit and the name of the vessel on which the goods have been loaded, even if they have been loaded on the vessel named in the bill of lading. This provision also applies whenever loading on board the vessel is indicated by pre printed wording on the bill of lading,

and

iii. indicates the port of loading and the port of discharge stipulated in the Credit, notwithstanding that it:

a. indicates a place of taking in charge different from the port of loading, and/or a place of final destination different from the port of discharge, and/or

b. contains the indication "intended" or similar qualification in relation to the port of loading and/or port of discharge, as long as the document also states the ports of loading and/or discharge stipulated in the Credit,

and

iv. consists of a sole original bill of lading or, if issued in more than one original, the full set as so issued, and

v. appears to contain all of the terms and conditions of carriage, or some of such terms and conditions by reference to a source or document other than the bill of lading (short form/blank back bill of lading); banks will not examine the contents of such terms and conditions,

and

vi. contains no indication that it is subject to a charter party and/or no indication that the carrying vessel is propelled by sail only, and

vii. in all other respects meets the stipulations of the Credit.

B. For the purpose of this Article, transshipment means unloading and reloading from one vessel to another vessel during the course of ocean carriage from the port of loading to the port of discharge stipulated in the Credit.

C. Unless transshipment is prohibited by the terms of the Credit, banks will accept a bill of lading which indicates that the goods will be transshipped, provided that the entire ocean carriage is covered by one and the same bill of lading.

D. Even if the Credit prohibits transshipment, banks will accept a bill of lading which:

i. indicates that the transshipment will take place as long as the relevant cargo is shipped in Container(s), Trailer(s) and/or "LASH" barge(s) as evidenced by the bill of lading, provided that the entire ocean carriage is covered by one and the same bill of lading,

and/or

ii. incorporates clauses stating that the carrier reserves the right to transship.

---

## ARTICLE 24

### Non Negotiable Sea Waybill

A. If a Credit calls for a non negotiable sea waybill covering a port to port shipment,

banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. appears on its face to indicate the name of the carrier and to have been signed or otherwise authenticated by:

• the carrier or a named agent for or on behalf of the carrier, or

• the master or a named agent for or on behalf of the master,

Any signature or authentication of the carrier or master must be identified as carrier or master, as the case may be. An agent signing or authenticating for the carrier or master must also indicate the name and the capacity of the party, i.e. carrier or master, on whose behalf that agent is acting,

and

ii. indicates that the goods have been loaded on board, or shipped on a named vessel.

Loading on board or shipment on a named vessel may be indicated by pre printed wording on the nonnegotiable sea waybill that the goods have been loaded on board a named vessel or shipped on a named vessel, in which case the date of issuance of the non negotiable sea waybill will be deemed to be the date of loading on board and the date of shipment.

In all other cases loading on board a named vessel must be evidenced by a notation on the non negotiable sea waybill which gives the date on which the goods have been loaded on board, in which case the date of the on board notation will be deemed to be the date of shipment.

If the non negotiable sea waybill contains the indication "intended vessel", or similar qualification in relation to the vessel, loading on board a named vessel must be evidenced by an on board notation on the non negotiable sea waybill which, in addition to the date on which the goods have been loaded on board, includes the name of the vessel on which the goods have been loaded, even if they have been loaded on the vessel named as the "intended vessel".

If the non negotiable sea waybill indicates a place of receipt or taking in charge different from the port of loading, the on board notation must also include the port of loading stipulated in the Credit and the name of the vessel on which the goods have been loaded, even if they have been loaded on a vessel named in the nonnegotiable sea waybill. This provision also applies whenever loading on board the vessel is indicated by pre printed wording on the non negotiable sea waybill,

and

iii. indicates the port of loading and the port of discharge stipulated in the Credit, notwithstanding that it:

a. indicates a place of taking in charge different from the port of loading, and/or a place of final destination different from the port of discharge,

and/or

b. contains the indication "intended" or similar qualification in relation to the port of loading and/or port of discharge, as long as the document also states the ports of loading and/or discharge stipulated in the Credit,

and

iv. consists of a sole original non negotiable sea waybill, or if issued in more than one original, the full set as so issued,

and

v. appears to contain all of the terms and conditions of carriage, or some of such terms and conditions by reference to a source or document other than the nonnegotiable sea waybill (short form/blank back nonnegotiable sea waybill); banks will not examine the

contents of such terms and conditions,

and

vi. contains no indication that it is subject to a charter party and/or no indication that the carrying vessel is propelled by sail only,

and

vii. in all other respects meets the stipulations of the Credit.

B. For the purpose of this Article, transshipment means unloading and reloading from one vessel to another vessel during the course of ocean carriage from the port of loading to the port of discharge stipulated in the Credit.

C. Unless transshipment is prohibited by the terms of the Credit, banks will accept a non negotiable sea waybill which indicates that the goods will be transshipped, provided that the entire ocean carriage is covered by one and the same non negotiable sea waybill.

D. Even if the Credit prohibits transshipment, banks will accept a non negotiable sea waybill which:

i. indicates that transshipment will take place as long as the relevant cargo is shipped in Container(s), Trailer(s) and/or "LASH" barge(s) as evidenced by the nonnegotiable sea waybill, provided that the entire ocean carriage is covered by one and the same non negotiable sea waybill,

and/or

ii. incorporates clauses stating that the carrier reserves the right to transship.

---

### ARTICLE 25

### Charter Party Bill of Lading

A. If a Credit calls for or permits a charter party bill of lading, banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. contains any indication that it is subject to a charter party,

and

ii. appears on its face to have been signed or otherwise authenticated by:

• the master or a named agent for or on behalf of the master, or

• the owner or a named agent for or on behalf of the owner.

Any signature or authentication of the master or owner must be identified as master or owner as the case may be. An agent signing or authenticating for the master or owner must also indicate the name and the capacity of the party, i.e. master or owner, on whose behalf that agent is acting, and

iii. does or does not indicate the name of the carrier,

and

iv. indicates that the goods have been loaded on board or shipped on a named vessel.

Loading on board or shipment on a named vessel may be indicated by pre printed wording on the bill of lading that the goods have been loaded on board a named vessel or shipped on a named vessel, in which case the date of issuance of the bill of lading will be deemed to be the date of loading on board and the date of shipment.

In all other cases loading on board a named vessel must be evidenced by a notation on the bill of lading which gives the date on which the goods have been loaded on board, in which case the date of the on board notation will be deemed to be the date of shipment, and

v. indicates the port of loading and the port of discharge stipulated in the Credit,

and

vi. consists of a sole original bill of lading or, if issued in more than one original, the full set as so issued,

and

vii. contains no indication that the carrying vessel is propelled by sail only,

and

viii. in all other respects meets the stipulations of the Credit.

B. Even if the Credit requires the presentation of a charter party contract in connection with a charter party bill of lading, banks will not examine such charter party contract, but will pass it on without responsibility on their part.

---

## ARTICLE 26

### Multimodal Transport Document

A. If a Credit calls for a transport document covering at least two different modes of transport (multimodal transport), banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. appears on its face to indicate the name of the carrier or multimodal transport operator and to have been signed or otherwise authenticated by:

• the carrier or multimodal transport operator or a named agent for or on behalf of the carrier or multimodal transport operator, or

• the master or a named agent for or on behalf of the master.

Any signature or authentication of the carrier, multimodal transport operator or master must be identified as carrier, multimodal transport operator or master, as the case may be. An agent signing or authenticating for the carrier, multimodal transport operator or master must also indicate the name and the capacity of the party, i.e. carrier, multimodal transport operator or master, on whose behalf that the agent is acting,

and

ii. indicates that the goods have been dispatched, taken in charge or loaded on board.

Dispatch, taking in charge or loading on board may be indicated by wording to that effect on the multimodal transport document and the date of issuance will be deemed to be the date of dispatch, taking in charge or loading on board and the date of shipment. However, if the document indicates, by stamp or otherwise, a date of dispatch, taking in charge or loading on board, such date will be deemed to be the date of shipment,

and

iii. a. indicates the place of taking in charge stipulated in the Credit which may be different from the port, airport or place of loading, and the place of final destination stipulated in the Credit which may be different from the port, airport or place of discharge,

and/or

b. contains the indication "intended" or similar qualification in relation to the vessel and/or port of loading and/or port of discharge,

and

iv. consists of a sole original multimodal transport document or, if issued in more than one original, the full set as so issued,

and

v. appears to contain all of the terms and conditions of carriage, or some of such terms and conditions by reference to a source or document other than the multimodal transport document (short form/blank back multimodal transport document); banks will not examine the contents of such terms and conditions,

and

vi. contains no indication that it is subject to a charter party and/or no indication that the carrying vessel is propelled by sail only, and

vii. in all other respects meets the stipulations of the Credit.

B. Even if the Credit prohibits transshipment, banks will accept a multimodal transport document which indicates that transshipment will or may take place, provided that the entire carriage is covered by one and the same multimodal transport document.

---

## ARTICLE 27

### Air Transport Document

A. If a Credit calls for an air transport document, banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. appears on its face to indicate the name of the carrier and to have been signed or otherwise authenticated by:

• the carrier, or

• a named agent for or on behalf of the carrier.

Any signature or authentication of the carrier must be identified as carrier. An agent signing or authenticating for the carrier must also indicate the name and the capacity of the party, i.e. carrier, on whose behalf that agent is acting,

and

ii. indicates that the goods have been accepted for carriage,

and

iii. where the Credit calls for an actual date of dispatch, indicates a specific notation of such date, the date of dispatch so indicated on the air transport document will be deemed to be the date of shipment.

For the purpose of this Article, the information appearing in the box on the air transport document (marked "For Carrier Use Only" or similar expression) relative to the flight number and date will not be considered as a specific notation of such date of dispatch.

In all other cases, the date of issuance of the air transport document will be deemed to be the date of shipment,

and

iv. indicates the airport of departure and the airport of destination stipulated in the Credit,

and

v. appears to be the original for consignor/shipper even if the Credit stipulates a full set of originals, or similar expressions,

and

vi. appears to contain all of the terms and conditions of carriage, or some of such terms and conditions, by reference to a source or document other than the air transport document; banks will not examine the contents of such terms and conditions,

and

vii. in all other respects meets the stipulations of the Credit.

B. For the purpose of this Article, transshipment means unloading and reloading from one aircraft to another aircraft during the course of carriage from the airport of departure to the airport of destination stipulated in the Credit.

C. Even if the Credit prohibits transshipment, banks will accept an air transport document which indicates that transshipment will or may take place, provided that the entire carriage is covered by one and the same air transport document.

## ARTICLE 28

### Road, Rail or inland Waterway Import Documents

A. If a Credit calls for a road, rail, or inland waterway transport document, banks will, unless otherwise stipulated in the Credit, accept a document of the type called for, however named, which:

i. appears on its face to indicate the name of the carrier and to have been signed or otherwise authenticated by the carrier or a named agent for or on behalf of the carrier and/or to bear a reception stamp or other indication of receipt by the carrier or a named agent for or on behalf of the carrier.

Any signature, authentication, reception stamp or other indication of receipt of the carrier, must be identified on its face as that of the carrier. An agent signing or authenticating for the carrier must also indicate the name and the capacity of the party, i.e. carrier, on whose behalf that agent is acting,

and

ii. indicates that the goods have been received for shipment, dispatch or carriage or wording to this effect. The date of issuance will be deemed to be the date of shipment unless the transport document contains a reception stamp, in which case the date of the reception stamp will be deemed to be the date of shipment, and

iii. indicates the place of shipment and the place of destination stipulated in the Credit,

and

iv. in all other respects meets the stipulations of the Credit.

B. In the absence of any indication on the transport document as to the numbers issued, banks will accept the transport document(s) presented as constituting a full set. Banks will accept as original(s) the transport document(s) whether marked as original (s) or not.

C. For the purpose of this Article, transshipment means unloading and reloading from one means of conveyance to another means of conveyance, in different modes of transport, during the course of carriage from the place of shipment to the place of destination stipulated in the Credit.

D. Even if the Credit prohibits transshipment, banks will accept a road, rail, or inland waterway transport document which indicates that transshipment will or may take place, provided that the entire carriage is covered by one and the same transport document and within the same mode of transport.

## ARTICLE 29

### Courier and Post Receipts

A. If a Credit calls for a post receipt or certificate of posting, banks will, unless otherwise stipulated in the Credit, accept a post receipt or certificate of posting which:

i. appears on its face to have been stamped or otherwise authenticated and dated in the place from which the Credit stipulates the goods are to be shipped or dispatched and such date will be deemed to be the date of shipment or dispatch,

and

ii. in all other respects meets the stipulations of the Credit.

B. If a Credit calls for a document issued by a courier or expedited delivery service evidencing receipt of the goods for delivery, banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. appears on its face to indicate the name of the courier/ service, and to have been stamped, signed or otherwise authenticated by such named courier/service (unless the Credit specifically calls for a document issued by a named Courier/Service, banks will accept a document issued by any Courier/Service),

and

ii. indicates a date of pick up or of receipt or wording to this effect, such date being deemed to be the date of shipment or dispatch,

and

iii. in all other respects meets the stipulations of the Credit.

---

## ARTICLE 30

### Transport Documents issued by Freight Forwarders

Unless otherwise authorized in the Credit, banks will only accept a transport document issued by a freight forwarder if it appears on its face to indicate:

i. the name of the freight forwarder as a carrier or multimodal transport operator and to have been signed or otherwise authenticated by the freight forwarder as carrier or multimodal transport operator,

or

ii. the name of the carrier or multimodal transport operator and to have been signed or otherwise authenticated by the freight forwarder as a named agent for or on behalf of the carrier or multimodal transport operator.

---

## ARTICLE 31

### "On Deck", "Shipper's Load and Count", Name of Consignor

Unless otherwise stipulated in the Credit, banks will accept a transport document which:

i. does not indicate, in the case of carriage by sea or by more than one means of conveyance including carriage by sea, that the goods are or will be loaded on deck. Nevertheless, banks will accept a transport document which contains a provision that the goods may be carried on deck, provided that it does not specifically state that they are or will be loaded on deck,

and/or

ii. bears a clause on the face thereof such as "shipper's load and count" or "said by shipper to contain" or words of similar effect,

and/or

iii. indicates as the consignor of the goods a party other than the Beneficiary of the Credit.

---

## ARTICLE 32

Clean Transport Documents A. A clean transport document is one which bears no clause or notation which expressly declares a defective condition of the goods and/or the packaging.

B. Banks will not accept transport documents bearing such clauses or notations unless

the Credit expressly stipulates the clauses or notations which may be accepted.

C. Banks will regard a requirement in a Credit for a transport document to bear the clause "clean on board" as complied with if such transport document meets the requirements of this Article and of Articles 23, 24, 25, 26, 27, 28 or 30.

---

## ARTICLE 33

### Freight Payable/Prepaid Transport Documents

A. Unless otherwise stipulated in the Credit, or inconsistent with any of the documents presented under the Credit, banks will accept transport documents stating that freight or transportation charges (hereafter referred to as "freight") have still to be paid.

B. If a Credit stipulates that the transport document has to indicate that freight has been paid or prepaid, banks will accept a transport document on which words clearly indicating payment or prepayment of freight appear by stamp or otherwise, or on which payment or prepayment of freight is indicated by other means. If the Credit requires courier charges to be paid or prepaid banks will also accept a transport document issued by a courier or expedited delivery service evidencing that the courier charges are for the account of a party other than the consignee.

C. The words "freight prepayable" or "freight to be prepaid" or words of similar effect, if appearing on transport documents, will not be accepted as constituting evidence of the payment of freight.

D. Banks will accept transport documents bearing reference by stamp or otherwise to costs additional to the freight, such as costs of, or disbursements incurred in connection with, loading, unloading or similar operations, unless the conditions of the Credit specifically prohibit such reference.

---

## ARTICLE 34

### Insurance Documents

A. Insurance documents must appear on their face to be issued and signed by insurance companies or underwriters or their agents.

B. If the insurance document indicates that it has been issued in more than one original, all the originals must be presented unless otherwise authorized in the Credit.

C. Cover notes issued by brokers will not be accepted, unless specifically authorized in the Credit.

D. Unless otherwise stipulated in the Credit, banks will accept an insurance certificate or a declaration under an open cover pre signed by insurance companies or underwriters or their agents. If a Credit specifically calls for an insurance certificate or a declaration under an open cover, banks will accept, in lieu thereof, an insurance policy.

E. Unless otherwise stipulated in the Credit, or unless it appears from the insurance document that the cover is effective at the latest from the date of loading on board or dispatch or taking in charge of the goods, banks will not accept an insurance document which bears a date of issuance later than the date of loading on board or dispatch or taking in charge as indicated in such transport document.

F. i. Unless otherwise stipulated in the Credit, the insurance document must be expressed in the same currency as the Credit.

ii. Unless otherwise stipulated in the Credit, the minimum amount for which the insurance document must indicate the insurance cover to have been effected is the CIF (cost, insurance and freight (..."named port of destination")) or CIP (carriage and insurance paid to (..."named place of destination")) value of the goods, as the case may be, plus 10%, but only when the CIF or CIP value can be determined from the

documents on their face. Otherwise, banks will accept as such minimum amount 110% of the amount for which payment, acceptance or negotiation is requested under the Credit, or 110% of the gross amount of the invoice, whichever is the greater.

## ARTICLE 35

### Type of Insurance Cover

A. Credits should stipulate the type of insurance required and, if any, the additional risks which are to be covered. Imprecise terms such as "usual risks" or "customary risks" shall not be used; if they are used, banks will accept insurance documents as presented, without responsibility for any risks not being covered.

B. Failing specific stipulations in the Credit, banks will accept insurance documents as presented, without responsibility for any risks not being covered.

C. Unless otherwise stipulated in the Credit, banks will accept an insurance document which indicates that the cover is subject to a franchise or an excess (deductible).

## ARTICLE 36

### All Risks Insurance Cover

Where a Credit stipulates "insurance against all risks", banks will accept an insurance document which contains any "all risks" notation or clause, whether or not bearing the heading "all risks", even if the insurance document indicates that certain risks are excluded, without responsibility for any risk(s) not being covered.

## ARTICLE 37

### Commercial Invoices

A. Unless otherwise stipulated in the Credit, commercial invoices;

i. must appear on their face to be issued by the Beneficiary named in the Credit (except as provided in Article 48),

and

u. must be made out in the name of the Applicant (except as provided in sub Article 48 (H)),

and

iii. need not be signed.

B. Unless otherwise stipulated in the Credit, banks may refuse commercial invoices issued for amounts in excess of the amount permitted by the Credit. Nevertheless, if a bank authorized to pay, incur a deferred payment undertaking, accept Draft(s), or negotiate under a Credit accepts such invoices, its decision will be binding upon all parties, provided that such bank has not paid, incurred a deferred payment undertaking, accepted Draft(s) or negotiated for an amount in excess of that permitted by the Credit.

C. The description of the goods in the commercial invoice must correspond with the description in the Credit. In all other documents, the goods may be described in general terms not inconsistent with the description of the goods in the Credit.

## ARTICLE 38

### Other Documents

If a Credit calls for an attestation or certification of weight in the case of transport other than by sea, banks will accept a weight stamp or declaration of weight which appears to have been superimposed on the transport document by the carrier or his

agent unless the Credit specifically stipulates that the attestation or certification of weight must be by means of a separate document.

# MISCELLANEOUS PROVISIONS

## ARTICLE 39

### Allowances in Credit Amount, Quantity and Unit Price

A. The words "about", "approximately", "circa" or similar expressions used in connection with the amount of the Credit or the quantity or the unit price stated in the Credit are to be construed as allowing a difference not to exceed 10% more or 10% less than the amount or the quantity or the unit price to which they refer.

B. Unless a Credit stipulates that the quantity of the goods specified must not be exceeded or reduced, a tolerance of 5% more or 5% less will be permissible, always provided that the amount of the drawings does not exceed the amount of the Credit. This tolerance does not apply when the Credit stipulates the quantity in terms of a stated number of packing units or individual items.

C. Unless a Credit which prohibits partial shipments stipulates otherwise, or unless sub Article (B) above is applicable, a tolerance of 5% less in the amount of the drawing will be permissible, provided that if the Credit stipulates the quantity of the goods, such quantity of goods is shipped in full, and if the Credit stipulates a unit price, such price is not reduced. This provision does not apply when expressions referred to in sub Article (A) above are used in the Credit.

## ARTICLE 40

### Partial Shipments/Drawings

A. Partial drawings and/or shipments are allowed, unless the Credit stipulates otherwise.

B. Transport documents which appear on their face to indicate that shipment has been made on the same means of conveyance and for the same journey, provided they indicate the same destination, will not be regarded as covering partial shipments, even if the transport documents indicate different dates of shipment and/or different ports of loading, places of taking in charge, or dispatch.

C. Shipments made by post or by courier will not be regarded as partial shipments if the post receipts or certificates of posting or courier's receipts or dispatch notes appear to have been stamped, signed or otherwise authenticated in the place from which the Credit stipulates the goods are to be dispatched, and on the same date.

## ARTICLE 41

### Installment Shipments/Drawings

If drawings and/or shipments by installments within given periods are stipulated in the Credit and any installment is not drawn and/or shipped within the period allowed for that installment, the Credit ceases to be available for that and any subsequent installments, unless otherwise stipulated in the Credit.

## ARTICLE 42

### Expiry Date and Place for Presentation of Documents

A. All Credits must stipulate an expiry date and a place for presentation of documents for payment, acceptance, or with the exception of freely negotiable Credits, a place for presentation of documents for negotiation. An expiry date stipulated for payment, acceptance or negotiation will be construed to express an expiry date for presentation

of documents.

B. Except as provided in sub Article 44(A), documents must be presented on or before such expiry date.

C. If an Issuing Bank states that the Credit is to be available "for one month", "for six months", or the like, but does not specify the date from which the time is to run, the date of issuance of the Credit by the Issuing Bank will be deemed to be the first day from which such time is to run. Banks should discourage indication of the expiry date of the Credit in this manner.

## ARTICLE 43

### Limitation on the Expiry Date

A. In addition to stipulating an expiry date for presentation of documents, every Credit which calls for a transport document(s) should also stipulate a specified period of time after the date of shipment during which presentation must be made in compliance with the terms and conditions of the Credit. If no such period of time is stipulated, banks will not accept documents presented to them later than 21 days after the date of shipment. In any event, documents must be presented not later than the expiry date of the Credit.

B. In cases in which sub Article 40(B) applies, the date of shipment will be considered to be the latest shipment date on any of the transport documents presented.

## ARTICLE 44

### Extension of Expiry Date

A. If the expiry date of the Credit and/or the last day of the period of time for presentation of documents stipulated by the Credit or applicable by virtue of Article 43 falls on a day on which the bank to which presentation has to be made is closed for reasons other than those referred to in Article 17, the stipulated expiry date and/or the last day of the period of time after the date of shipment for presentation of documents, as the case may be, shall be extended to the first following day on which such bank is open.

B. The latest date for shipment shall not be extended by reason of the extension of the expiry date and/or the period of time after the date of shipment for presentation of documents in accordance with sub Article (A) above. If no such latest date for shipment is stipulated in the Credit or amendments thereto, banks will not accept transport documents indicating a date of shipment later than the expiry date stipulated in the Credit or amendments thereto.

C. The bank to which presentation is made on such first following business day must provide a statement that the documents were presented within the time limits extended in accordance with sub Article 44(A) of the Uniform Customs and Practice for Documentary Credits, 1993 Revision, ICC Publication No. 500.

## ARTICLE 45

### Hours of Presentation

Banks are under no obligation to accept presentation of documents outside their banking hours.

## ARTICLE 46

### General Expressions as to Dates for Shipment

A. Unless otherwise stipulated in the Credit, the expression "shipment" used in

stipulating an earliest and/or a latest date for shipment will be understood to include expressions such as, "loading on board", "dispatch", "accepted for carriage", "date of post receipt", "date of pick up", and the like, and the case of a Credit calling for a multimodal transport document the expression "taking in charge".

B. Expressions such as "prompt", "immediately", "as soon as possible", and the like should not be used. If they are used banks will disregard them.

C. If the expression "on or about" or similar expressions are used, banks will interpret them as a stipulation that the shipment is to be made during the period from five days before to five days after the specified date, both end days included.

---

## ARTICLE 47

### Date Terminology for Periods of Shipment

A. The words "to", "until", "till", "from" and words of similar import applying to any date or period in the Credit referring to shipment will be understood to include the date mentioned.

B. The word "after" will be understood to exclude the date mentioned.

C. The terms "first half", "second half of a month shall be construed respectively as the 1st to the 15th, and the 16th to the last day of such month, all dates inclusive.

D. The terms "beginning", "middle", or "end" of a month shall be construed respectively as the 1st to the 10th, the 11th to the 20th, and the 21st to the last day of such month, all dates inclusive.

---

# TRANSFERABLE CREDIT

## ARTICLE 48

### Transferable Credit

A. A transferable Credit is a Credit under which the Beneficiary (First Beneficiary) may request the bank authorized to pay, incur a deferred payment undertaking, accept or negotiate (the "Transferring Bank"), or in the case of a freely negotiable Credit, the bank specifically authorized in the Credit as a Transferring Bank, to make the Credit available in whole or in part to one or more other Beneficiary(ies) (Second Beneficiary (ies)).

B. A Credit can be transferred only if it is expressly designated as "transferable" by the Issuing Bank. Terms such as "divisible", "fractionable", "assignable", and "transmissible" do not render the Credit transferable. If such terms are used they shall be disregarded.

C. The Transferring Bank shall be under no obligation to effect such transfer except to the extent and in the manner expressly consented to by such bank.

D. At the time of making a request for transfer and prior to transfer of the Credit, the First Beneficiary must irrevocably instruct the Transferring Bank whether or not he retains the right to refuse to allow the Transferring Bank to advise amendments to the Second Beneficiary(ies). If the Transferring Bank consents to the transfer under these conditions, it must, at the time of transfer, advise the Second Beneficiary(ies) of the First Beneficiary's instructions regarding amendments.

E. If a Credit is transferred to more than one Second Beneficiary(ies), refusal of an amendment by one or more Second Beneficiary(ies) does not invalidate the acceptance (s) by the other Second Beneficiary(ies) with respect to whom the Credit will be amended accordingly. With respect to the Second Beneficiary(ies) who rejected the amendment, the Credit will remain unammended.

F. Transferring Bank charges in respect of transfers including commissions, fees, costs

or expenses are payable by the First Beneficiary, unless otherwise agreed. If the Transferring Bank agrees to transfer the Credit it shall be under no obligation to effect the transfer until such charges are paid.

G. Unless otherwise stated in the Credit, a transferable Credit can be transferred once only. Consequently, the Credit cannot be transferred at the request of the Second Beneficiary to any subsequent Third Beneficiary. For the purpose of this Article, a retransfer to the First Beneficiary does not constitute a prohibited transfer.

Fractions of a transferable Credit (not exceeding in the aggregate the amount of the Credit) can be transferred separately, provided partial shipment/drawings are not prohibited, and the aggregate of such transfers will be considered as constituting only one transfer of the Credit.

H. The Credit can be transferred only on the terms and conditions specified in the original Credit, with the exception of:

• the amount of the Credit,

• any unit price stated therein,

• the expiry date,

• the last date for presentation of documents in accordance with Article 43

• the period for shipment, any or all of which may be reduced or curtailed.

The percentage for which insurance cover must be effected may be increased in such a way as to provide the amount of cover stipulated in the original Credit, or these Articles.

In addition, the name of the First Beneficiary can be substituted for that of the Applicant, but if the name of the Applicant is specifically required by the original Credit to appear in any document(s) other than the invoice, such requirement must be fulfilled.

I. The First Beneficiary has the right to substitute his own invoice(s) (and Draft(s)) for those of the Second Beneficiary(ies), for amounts not in excess of the original amount stipulated in the Credit and for the original unit prices if stipulated in the Credit, and upon such substitution of invoice(s) (and Draft(s)) the First Beneficiary can draw under the Credit for the difference, if any, between his invoice(s) and the Second Beneficiaries(ies') invoice(s).

When a Credit has been transferred and the First Beneficiary is to supply his own invoice(s) (and Draft(s)) in exchange for the Second Beneficiary's(ies') invoices(s) (and Draft(s)) but fails to do so on first demand, the Transferring Bank has the right to deliver to the Issuing Bank the documents received under the transferred Credit, including the Second Beneficiary's(ies') invoice(s) (and Draft(s)) without further responsibility to the First Beneficiary.

J. The First Beneficiary may request that payment or negotiation be effected to the Second Beneficiary(ies) at the place to which the Credit has been transferred up to and including the expiry date of the Credit, unless the original Credit expressly states that it may not be made available for payment or negotiation at a place other than that stipulated in the Credit. This is without prejudice to the First Beneficiary's right to substitute subsequently his own invoice(s) (and Draft(s)) for those of the Second Beneficiary(ies) and to claim any difference due to him.

## ASSIGNMENT OF PROCEEDS

### ARTICLE 49

### Assignment of Proceeds

The fact that a Credit is not stated to be transferable shall not affect the Beneficiary's

right to assign any proceeds to which he may be, or may become, entitled under such Credit, in accordance with the provisions of the applicable law. This Article relates only to the assignment of proceeds and not to the assignment of the right to perform under the Credit itself.

---

# ICC ARBITRATION

Contracting parties that wish to have the possibility of resorting to ICC Arbitration in the event of a dispute with their contracting partner should specifically and clearly agree upon ICC Arbitration in their contract or, in the event no single contractual document exists, in the exchange of correspondence which constitutes the agreement between them. The fact of issuing a letter of credit subject to the UCP 500 does NOT by itself constitute an agreement to have resort to ICC Arbitration. The following standard arbitration clause is recommended by the ICC:

"All disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules".

Copyright 1993 by International Chamber of Commerce. All rights reserved.

Reprinted here with the permission of the ICC Publishing Inc. New York.

---

[ Back to the top ]

---

.:.   © 2002-2003 by WeR2031.Group    .:.    Designed by ESCAPER    .:.

# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | Civil Action No. 04-12634-NG |
| H. BRUCE BOAL and SCOTT LEE | ) |  |
| BOAL, A Partnership d/b/a BOALEECO, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | **AFFIDAVIT OF MICHAEL E. EVANS** |
| FLEETBOSTON FINANCIAL | ) |  |
| CORPORATION (f/k/a Fleet National | ) |  |
| Bank) | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

Michael E. Evans, being duly sworn, deposes and says:

I am an Operations Manager for defendant Fleet National Bank ("Fleet"). I supervise the Standby Letter of Credit Unit located in Scranton, Pennsylvania. I submit this Affidavit based on my personal knowledge and on my review of books and records maintained by Fleet in the ordinary course of business.

1.     On or about October 21, 1988 Fleet's predecessor, Bank of Boston, at the request of its customer, Boaleeco, issued its irrevocable standby letter of credit number 50027518 (the "Letter of Credit") in favor of the Supreme Council of Universities located in Cairo, Egypt.  In 1989 the Letter of Credit was amended and the beneficiary was changed to the Central Bank of Egypt ("CBE").  The Letter of Credit was subsequently confirmed by Citibank, N.A. ("Citibank").  A copy of the original Letter of Credit and pertinent amendments is attached as Exhibit A.

2.      The Letter of Credit was issued subject to the Uniform Customs and Practice for Documentary Credits ("UCP"), *International Chamber of Commerce*, Publication No. 400 (1983 revision). The UCP has since been updated, and the letter of credit application specifically provided that the letter of credit was subject to any updated versions of the UCP. The current version is International Chamber of Commerce Publication No. 500 (1993). A copy of the UCP is attached to the memorandum of law submitted in opposition to the application for injunctive relief.

3.      By the terms of the Letter of Credit, $50,000 is available upon presentation of conforming documents. Here, Citibank, the confirming bank, has been presented with conforming documents and is obligated to collect the funds for the beneficiary, CBE.

4.      Citibank, in turn, has requested reimbursement from Fleet.

5.      Fleet has no specific knowledge of and plays no part in the underlying business arrangement by which plaintiff was obligated to provide a guarantee in favor of the Supreme Council of Universities. Rather, Fleet looks only at any documents presented to it. Where there is a confirming bank, Fleet relies on the confirming bank to review the documents to determine if payment is required. Here, Citibank has determined that the documents required for payment are conforming and is obligated to pay the amount of the Letter of Credit to the beneficiary.

6.      Fleet has a good reputation in international banking circles for honesty in honoring its obligations. Fleet will suffer injury to its reputation if this court enjoins Fleet from making payment on the Letter of Credit.

SIGNED UNDER THE PENALTIES OF PERJURY THIS �humbered TH DAY OF DECEMBER, 2004.

_____
Michael E. Evans

- 2 -

# EXHIBIT A

# TO

# EVANS AFFIDAVIT

**THE FIRST NATIONAL BANK OF BOSTON**
POST OFFICE BOX 1763
BOSTON, MASSACHUSETTS 02105 U.S.A.

AMENDMENT                                    DATE: June 30, 1989

ADVISING BANK                          CONFIRMING OUR CABLE OF TODAY

CENTRAL BANK OF EGYPT                  Credit Number:
1, EL ALFY STREET                       I-053-NETS-50027518
CAIRO, EGYPT A.R.E.                     Opener Reference No:
                                           B/30375


Dear Sirs:

 We are instructed by :

BOALEECO
WATERS WAY INDUSTRIAL PARK
56 PULASKI STREET
PEABODY, MA  01960

By order of BOALEECO, INC.
 to amend our credit 50027518 as issued  in favor of :

SUPREME COUNCIL OF UNIVERSITIES
FOREIGN RELATIONS CO-ORDINATION
UNIT
CAIRO UNIVERSITY BLDG.
GIZA, CAIRO, EGYPT A.R.E.

This amendment is an integral part of the original credit.
All other terms and conditions of the original credit instrument remain
unchanged.

 Amended terms :

Amended Beneficiary:

CENTRAL BANK OF EGYPT
1, EL ALFY STREET
CAIRO, EGYPT A.R.E.

Expiration date: December 1, 1989

BENEFICIARY OF OUR CREDIT NOW CENTRAL BANK OF EGYPT
PLEASE ISSUE YOUR GUARANTEE IN FAVOR OF SUPREME COUNCIL OF UNIVERSITIES
FOREIGN RELATIONS CO-ORDINATION UNIT, CAIRO UNIVERSITY BLDG., GIZA,
CAIRO, EGYPT A.R.E.FOR US$157,170.00 VALID UNTIL NOVEMBER 1, 1989
RELATIVE TO THE FAILURE OF BOALEECO TO COMPLY WITH THE TERMS OF CONTRACT
NO. SCU/25/88/ARF.

TO SUPPORT YOUR GUARANTEE OUR CREDIT NOW IN YOUR FAVOR IS PAYABLE
AGAINST DRAFT AT SIGHT ON THE FIRST NATIONAL BANK OF BOSTON, BOSTON, MA
ACCOMPANIED BY YOUR SIGNED STATEMENT CERTIFYING: "THE AMOUNT OF OUR
DRAFT REPRESENTS FUNDS WE HAVE BEEN REQUIRED TO PAY UNDER OUR GUARANTEE
 FAVOR OF SUPREME COUNCIL OF UNIVERSITIES FOREIGN RELATIONS
  ORDINATION UNIT, CAIRO UNIVERSITY BLDG., GIZA, CAIRO, EGYPT A.R.E. ON
 ALF OF BOALEECO RELATIVE TO THE FAILURE OF BOALEECO TO COMPLY WITH

OFFICE RECORD

3

**BANK OF BOSTON**

THE FIRST NATIONAL BANK OF BOSTON
POST OFFICE BOX 1763
BOSTON, MASSACHUSETTS 02105 U.S.A.

AMENDMENT                                         DATE: June 30, 1989


PAYMENT IS AVAILABLE AGAINST YOUR SIMPLE DEMAND BY TELEX OR CABLE
CERTIFYING ALL TERMS COMPLIED WITH AND DOCUMENTS BEING AIRMAILED.

OUR CREDIT TO EXPIRE DECEMBER 1, 1989

FOR REFERENCE YOUR NUMBER INDICATED ON CHARGES PAID IS 12/CC22L/G
This letter is to accompany all draft(s) and documents. When presenting
your draft(s) and documents or when/communicating with us please make
reference to our reference number shown above.


                    Yours very truly,


                    _____
                    Authorized Official


1492 (REV. 5/83)

OFFICE RECORD

3

| SENDER<br>SWFT ADDRESS | RECEIVER<br>SWFT ADDRESS | MSG<br>TYPE | L/C<br>ID | DOC TRACK<br>ID | STATUS | ERROR<br>FOUND |
|---|---|---|---|---|---|---|
| CITIUS33AXXX | FNBBIB33AXXX | 799 | 0000000000000 | 0000001671904 | LOG | YES |

TRN #: 041208023263


CITIBANK
ATTN. MARIA COCUILO
111 WALL STREET 16TH FLOOR ZONE 1
NEW YORK                NY 10043

:20 : TRANSACTION REFERENCE NUMBER
:    : 09617648
:    :
:21 : RELATED REFERENCE
:    : I850027518
:    :
:79 : NARRATIVE
:    : SBLC CLAIM FOR USD50,000.00
:    : .
:    : WE HEREBY ADVISE YOURSELVES THAT WE ARE IN
:    : RECEIPT OF DEMAND FOR PAYMENT FROM THE
:    : BENEFICIARY CENTRAL BANK OF EGYPT AS THE
:    : APPLICANT BUALEECO, INC. HAS FAILED TO COMPLY
:    : WITH THE TERMS OF CONTRACT NO. SCU/25-88/ARF.
:    : UNDER A/M SBLC IN ORDER, COMPLIANT WITH SBLC
:    : TERMS.
:    : .
:    : URGENTLY, PLEASE REMIT FUNDS TO CITIBANK, N.A.
:    : 0210 0 0089 F/O MCA 3603008 ATTN MARJORIE
:    : FRANCIS-HADLEY  QUOTING OUR REF 09617648. CLAIM
:    : TOTALLING USD50,160.02 COMPRISING OF PRINCIPAL
:    : PYMT USD50,000.00
:    : CORRESP. CHGS USD10.02 PLUS OUR PAYMENT COMM.
:    : USD150.00.
:    : .
:    : REGARDS, DEC. 8, 2004
:    : MARJORIE FRANCIS-HADLEY
:    : TEL. 813-604-7094
:    : FAX. 813-604-7070
:    :

RECEIVED
FLEET BANK N.A.

2003 AUG 11  PM 12: 44

GLOBAL TRADE
OPERATIONS

# Central Bank Of Egypt
## Credits Dept.

AIR MAIL
REGISTERED

In reply please quote
Ref.No.  22L/G

Cairo, 2 7 JUL 2003

FLEET NATIONAL BANK,
100 FEDERAL STREET
BOSTON, MA,
U.S.A.

ATT: MICHAEL  GRIZZANTI
SCRANTON, PA 18507

**Outstanding Balance of Letter of Guarantee
Issued by us according to your instructions
As shown in our records as at 30.6.2003**

Dear Sirs,

We quote hereunder the statement of the above-mentioned Guarantee as at 30.6.2003.

| Guarantee No. Ours / Yours. | Balance at 30.6.2003 | Validity |
|---|---|---|
| MM 3572/1 S 50027518 | USD. 50000 | 31.10.2003 |

Confirmed by Citibank, New York, U.S.A.

We shall be much obliged if you will kindly notify to us correctness of the said information. In the event of not receiving any remarks thereof, within thirty days, it will be considered as correct and agreed by you.

Your co-operation in this respect will be highly appreciated.

**N.B.**

Please send your confirmation to our following external auditor and a copy to us:-

Yours Faithfully

HOSNY A. Khalil

Assistant Manager    P. 13

Mr. Zarok, Khaled and Co.,
1 Wady El Nile, St.,
Mohandessen,
P.O.Box 12655/110
Giza, A.R.E.

M.

---

1 Alfy St., Cairo, Egypt          Tel.: 5930261 – 5916276     Fax.:5902309
E.Mail-credit@cbe.org.eg

TE OF AMENDMENT: APRIL 23, 2004

AMENDMENT TO LETTER OF CREDIT NO.
1S50027518
DATE OF ISSUE: AUGUST 1, 1999

ISSUING BANK:
FLEET NATIONAL BANK
C/O GLOBAL TRADE OPERATIONS
1 FLEET WAY, MAIL STOP: PAEH0802SM
SCRANTON PA 18507-1999

APPLICANT:
BOALEECO
WATERS WAY INDUSTRIAL PARK
56 PULASKI STREET
PEABODY, MA 01960

ADVISING BANK:
CITIBANK
111 WALL STREET
NEW YORK, NY 10043

BENEFICIARY:
CENTRAL BANK OF EGYPT
1, EL ALFY STREET
CAIRO 00000

THE ABOVE MENTIONED CREDIT IS AMENDED AS FOLLOWS:

THE DATE OF EXPIRY IS AMENDED TO DECEMBER 30, 2004.

ALL CORRESPONDENCE INCLUDING PRESENTATIONS UNDER THIS LETTER OF CREDIT SHALL BE
SENT TO FLEET NATIONAL BANK, ATTN: GLOBAL TRADE OPERATIONS DEPT., STANDBY UNIT,
1 FLEET WAY, SCRANTON, PA 18507.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

ADDITIONAL INSTRUCTIONS FOR ADVISING CORRESPONDENT BANK :
PLEASE ADVISE CENTRAL BANK OF EGYPT TO EXTEND GUARANTEE NO. C/D/LG MM3572 TO 30
NOVEMBER 2004.

SENT SWIFT
----------------------------
AUTHORIZED SIGNATURE



STANDBY
LETTER OF CREDIT APPLICATION

# BANK OF BOSTON
THE FIRST NATIONAL BANK OF BOSTON
P.O. BOX 1763             BOSTON, MA 02105

Date___October 20, 1988___

Applicant's Reference No.___B/30375___

| FOR BANK USE ONLY |
|---|
| PARTY NO._____  LETTER TYPE_____  OCT 21 1988 |

## PLEASE OPEN AN IRREVOCABLE STANDBY LETTER OF CREDIT UNDER THE TERMS SET FORTH BELOW

Standby Letter of Credit to be sent by:
- ☐ Mail
- ☐ Express Mail
- ☐ Airmail
- ☒ Full Text Cable
- ☐ Airmail with Preadvice Cable
- ☐ Courier (limited availability)

| Account Party (Opener) | Beneficiary |
|---|---|
| Boaleeco<br>56 Pulaski Street<br>Peabody, MA  01960 | Supreme Council of Universities<br>Foreign Relations Co-ordination Unit<br>Cairo University Bldg.<br>Giza, Cairo, Egypt   A. R. E. |

Advising Bank (if beneficiary specifies bank)_____

Central Bank of Egypt
1, El Alfy Street
Cairo, Egypt  A. R. E.

Amount___US$ 157,170.00___
(Indicate Currency)

Available against the
beneficiary's drafts drawn at sight on
The First National Bank of Boston
Boston, Massachusetts

Expiry Date (Required)   Nov. 1, 1989

Effective Date (Not Required)

TEXT: (Required)    (per attached text)

_(Should additional space be required, use back page of this form.)_

☐ Standby Letter ot Credit is transferable
☐ Special Instructions

---

The opening of this credit substantially in the form requested herein, is subject to the terms and conditions as set forth in the Standby Letter of Credit Agreement on the next page to which we agree.

Note to Correspondent Bank or Third Party Obligor: Please sign as Applicant. Signature of Account Party (opener) should be affixed below.

BOALEECO

_Applicant (Authorized Signature)_

56 Pulaski Street

_Applicant Address_

Peabody, MA   01960

Telephone    (508) 532-9266

_(Customer)_

# STANDBY LETTER OF CREDIT AGREEMENT

"Application" means the written application by the Customer to the Bank for the issuance of a letter of credit and includes all modifications made with the Customer's written or oral agreement or consent.

"Bank" means The First National Bank of Boston and includes its overseas branches.

"Collateral" includes all property in which the Bank at any particular time has a security interest and the proceeds thereof.

"Credit" means a letter of credit issued pursuant to the Application, including any amendments or modifications of such Credit.

"Customer" means the party or parties signing the Application jointly and severally if more than one.

"Uniform Customs and Practice" means the "Uniform Customs and Practice for Documentary Credits (1983 Revision), International Chamber of Commerce, Publication No. 400, and any subsequent revisions thereof approved by the International Chamber of Commerce.

---

In consideration of the Bank opening at the Customer's request, a Credit, the Customer hereby agrees with the Bank as follows:

**1.** The Customer will pay the Bank, in United States currency, the amount of each drawing under the Credit, together with interest, commissions, all customary charges, and all other disbursements or payments by the Bank pursuant to the Credit or this Agreement, such payment to be made on demand with interest from the date of payment under the Credit to the date of payment by the Customer to the Bank. If a drawing is payable in foreign currency, the Customer will pay the Bank the equivalent of the amount of such drawing in United States currency, at the Bank's then selling rate for cable transfers to the place of payment or to the place of the Bank's settlement of its obligation, as the Bank may require. If there is no rate of exchange for effecting such cable transfer, the Customer will pay the Bank on demand the amount in United States currency equivalent to the Bank's actual cost of settlement, with interest on the amount in United States currency payable by the Customer from the date of settlement to the date of payment by the Customer. Unless otherwise agreed, interest and commission payable hereunder shall be at such rate as the Bank may deem appropriate; provided however, that the rate of interest on default on any of the Customer's obligations hereunder will be 125 percent of the Base Rate. The Base Rate is the rate of interest announced from time to time by the Bank at its head office as its Base Rate. Any amount which at any time may be owing by the Customer to the Bank pursuant to this Agreement may be charged against any funds held by the Bank for the account of the Customer.

**2.** The Customer will promptly examine (a) the copy of the Credit (and any amendments thereof) sent to it by the Bank and (b) all instruments and documents delivered to it from time to time by the Bank, and the Customer will, within twenty-four (24) hours or receipt thereof, notify the Bank of any irregularity or claim of non-compliance with the Customer's instructions. The Customer is conclusively deemed to have waived any such claim against the Bank and its correspondents unless such notice is given as aforesaid.

**3.** The Customer agrees to indemnify the Bank and its correspondents for and hold them harmless against any and all claims, loss, liability, or damage, including reasonable attorney fees, howsoever arising from or in connection with the Credit. The agreements in this paragraph will survive any payment under or termination of this Agreement.

**4.** The Customer will pay the Bank on demand all charges, costs, and expenses, including reasonable attorney fees, incurred or paid by the Bank in connection with the exercise of any right, power, or remedy hereunder, or in the enforcement thereof.

**5.** Any deposits or other sums at any time credited by or due from the Bank to the Customer and any securities or other property of the Customer in the possession of the Bank or any of its correspondents may at all times be held and treated as Collateral for the payment of any obligations of the Customer to the Bank hereunder, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising. Regardless of the adequacy of any Collateral, any deposits or other sums credited by or due from the Bank to the Customer may, at any time, be applied to or set off against such liabilities and obligations without notice.

**6.** If the Bank shall in good faith deem itself insecure at any time, or upon (1) failure of the Customer to perform any of its obligations under this Agreement, or any of its obligations for borrowed money or in respect of

any extension of credit or accommodation under any lease, (2) the death, insolvency, dissolution, termination of existence, suspension of business, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under any law relating to Bankruptcy or insolvency by or against the Customer, (3) the issuance of application for a writ or order of attachment or garnishment against any Collateral or a substantial part of the property or assets of the Customer, or (4) any governmental authority, or any court at the instance of any governmental authority, taking possession of any substantial part of the property of the Customer or assuming control over the affairs or operations of the Customer, thereupon, the Bank may, (a) without notice or demand, declare any and all of the obligations and liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Customer to the Bank under this Agreement, to be immediately due and payable, and the Bank will have all of the rights and remedies provided hereunder and by law and/or (b) require the Customers to deliver to the Bank to be held and treated as Collateral such other property of the Customer equal in amount or value to 125% of the Credit, and the Customer shall promptly deliver the same upon request.

**7.** Neither the Bank nor its correspondents shall be in any way responsible for performance by any Beneficiary of its obligations to the Customer, nor for the term, sufficiency, correctness, genuineness, authority of person signing, falsification or legal effect of any documents called for under the Credit if such documents on their face appear to be in order.

**8.** The Bank may honor, as complying with the terms of the Credit and of the Application therefor, any drafts or other documents otherwise in order signed or issued by an administrator, executor, conservator, trustee in Bankruptcy, debtor in possession, assignee for benefit of creditors, liquidator, receiver, or other legal representative of the party authorized under the Credit to draw or issue such drafts or other documents.

**9.** Unless otherwise expressly agreed to, the Customer hereby authorizes the Bank to (a) select an advising bank, if any, (b) authorize or restrict negotiation under the Credit, and (c) waive any such restriction on negotiation.

**10.** This Agreement and a request or consent to any modification, change, amendment, waiver, or any other action pursuant to this Agreement, will be binding upon the Customer and its respective heirs, executors, administrators, successors, and assigns and will inure to the benefit of and be enforceable by the Bank, its successors, and assigns. In the event that any provision hereof is determined by a court of competent jurisdiction to be invalid, such invalidity will not affect any other provision of this Agreement. The Customer represents and warrants that the execution, delivery, and performance by the Customer hereof has been duly authorized by all necessary corporate and/or other action and that the making and performance hereof by the Customer does not and will not contravene the terms of any existing law, agreement, or instrument by which the Customer is bound or to which the Customer is subject.

**11.** The failure of the Bank to enforce at any time any provision hereof will not be construed to be a waiver of such provision or of the right of the Bank thereafter to enforce any such provision.

**12.** The Credit will be subject to, and performance by the Bank, its correspondents and the Beneficiary thereunder will be governed by, the Uniform Customs and Practice, except to the extent it is otherwise expressly agreed. In the event the Credit is subject to laws other than the Uniform Customs and Practice, any action, inaction, or omission on the part of the Bank or its correspondents in connection with the Credit, and in good faith reliance on such laws, will be deemed to be in compliance with the Credit and this Agreement and the Customer hereby indemnifies the Bank and its correspondents from and holds them harmless against any and all loss, liability, damage, cost, or expense (including reasonable attorney fees) incurred thereby.

**13.** It is agreed that all directions and correspondence relating to the Credit are to be sent at the Customer's risk and that the Bank does not assume any responsibility for any inaccuracy, interruption, error, or delay in transmission or delivery by post, telegraph, cable, or courier for any inaccuracy of translation.

**14.** This Agreement is made in the Commonwealth of Massachusetts and shall be deemed to be a contract under seal to be governed by and construed in accordance with the laws of said Commonwealth. The Bank's rights, powers, and remedies specified herein are cumulative and are in addition to those otherwise created or existing by law or agreement.